WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Emma Josephine Davis, | No. CV-13-00679-TUC-CRP |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security | |
| Defendant. | |

Plaintiff Emma Josephine Davis has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent. (Doc. 9).  Pending before the Court are Plaintiff's Opening Brief (Doc. 19) ("Plaintiff's Brief"), Defendant's Memorandum in Support of the Commissioner's Decision (Doc. 24), and Plaintiff's Reply (Doc. 26).  For the following reasons, the Court remands this matter for an immediate award of benefits.

**BACKGROUND**

Davis, who was born on October 13, 1959, applied for disability insurance benefits in February 2010, alleging that since April 7, 2008 she has been unable to work due to ulcerative colitis, fibromyalgia, osteoarthritis, depression, and anxiety. (Administrative Record ("AR.") 167-170, 177, 224).   Davis has a high school

equivalency degree.  (AR. 21, 80).  From 1998 through May 2008, she worked in retail as cashier/customer service clerk, and during 2000 to 2004, she also worked as a mentor at a residential facility for the disabled where she cooked, cleaned, administered medications and took residents to doctors' appointments.  (AR. 48, 180).

At the time of the hearing before the ALJ, Plaintiff lived with her husband, her daughter, and two grandchildren who are 9 and 12 years of age.  (AR. 75).  Plaintiff testified that she has ulcerative colitis, depression, anxiety, difficulty concentrating, headaches, dizziness, deafness in her left ear, arthritis and fibromyalgia.  (AR. 43-45, 56, 67).  She experiences pain in her legs, knees, back, fingers, elbow, left ear, and head.  (AR. 56).  Injections, radio frequency ablation, facet blocks, and use of a TENS unit have provided only temporary relief for her pain.  (AR. 56-58).  She also testified that her ulcerative colitis is under control with medications, but she does experience "a flew flare-ups…once or twice every month."  (AR. 52 (the flare ups last about 20 to 30 minutes)).  Plaintiff's depression causes her to sleep most of the day and she spends most of the day in bed.  (AR. 67-69; *see also* AR. 67 ("I wake--every four hours…[to] go to the bathroom.")).  On days she feels better, she will sit outside or in the living room.  (AR. 69).  Plaintiff has crying spells every other day and suffers from anxiety on a daily basis that makes her feel "[l]ike I want to jump out of my skin."  (AR. 71-72).  During panic attacks, which she has every two months or so and which last about ten to fifteen minutes, she shakes and her heart races.  (*Id.*).  Plaintiff does not drive and she stopped going to church in approximately December 2011.  (AR. 73).

Plaintiff's application was denied on initial review and again on reconsideration, after which Plaintiff requested that her claim proceed to hearing before an administrative law judge. (AR. 115-123, 155).  A hearing was held on February 27, 2012 before Administrative Law Judge George W. Reyes ("ALJ") at which Davis, who was represented by counsel, and vocational expert Ruth Van Vleet ("VE") testified.  (AR.  39-91). On April 12, 2012, the ALJ issued his decision finding Plaintiff was not disabled under the Social Security Act.  (Tr. 22-32).  Thereafter, the Appeals Council denied

1  Plaintiff's request for review, thus rendering the ALJ's April 12, 2012 Decision the final
2  decision of the Commissioner.  (Tr. 1-6).

3  Davis then initiated the instant action, arguing that: (1) the ALJ erred by rejecting
4  the assessments of her treating physician, Yuhee Kim, M.D.,; (2) the ALJ erred by
5  rejecting the assessment of her treating psychiatric nurse practitioner, Judy Hileman,
6  N.P.; (3) the ALJ erred in rejecting her symptom testimony; and (4) the ALJ erred by
7  determining that her work capacities without support by substantial evidence of record.
8  (Plaintiff's Brief, p. 1).

9  Defendant contends that the ALJ's decision is supported by substantial evidence
10  of record.

11  **STANDARD**

12  The Court has the "power to enter, upon the pleadings and transcript of the record,
13  a judgment affirming, modifying, or reversing the decision of the Commissioner of Social
14  Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).  The
15  factual findings of the Commissioner shall be conclusive so long as they are based upon
16  substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g), 1383(c)(3);
17  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the
18  Commissioner's denial of disability insurance benefits when the ALJ's findings are based
19  on legal error or are not supported by substantial evidence in the record as a whole."
20  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Brown-*
21  *Hunter v. Colvin,* __ F.3d __, 2015 WL 4620123, *4 (9th Cir. Aug. 4, 2015).

22  Substantial evidence is "'more than a mere scintilla[,] but not necessarily a
23  preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d
24  871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098.   Further, substantial
25  evidence is "such relevant evidence as a reasonable mind might accept as adequate to
26  support a conclusion."  *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the
27  evidence can support either outcome, the court may not substitute its judgment for that of
28  the ALJ."  *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th

Cir. 1992)).   Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the Court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

## DISCUSSION

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  *See* 20 C.F.R. §§404.1520, 416.920.  To establish disability, the claimant must show: (1) she has not worked since the alleged disability onset date ("Step One"); (2) she has a severe impairment ("Step Two"); and (3) her impairment meets or equals a listed impairment ("Step Three") or her residual functional capacity ("RFC") precludes the performance of her past work ("Step Four").  At step five, the Commissioner must show that the claimant is able to perform other work.

### THE ALJ'S FINDINGS IN PERTINENT PART

The ALJ determined that Plaintiff had not engaged in substantial gainful employment during the period from her alleged onset date of April 7, 2008 through her date last insured of December 31, 2011.  (AR. 24).  The ALJ found that Plaintiff suffered from the following severe impairments:  ulcerative colitis, fibromyalgia, osteoarthritis, depression, and anxiety.  (*Id.*).  The ALJ went on to find that although Davis could not perform her past relevant work (AR. 31), she was capable of:

> Perform[ing] light work as defined in 20 CFR § 404.1567(b) except that she is precluded from using ladders, ropes, and scaffolds; is also limited to only occasionally using ramps and stairs; and is further limited to only occasional balancing, kneeling stooping, crouching and crawling.  She must avoid concentrated exposure to hazards, commonly defined as dangerous machinery or unprotected heights.  She is further limited to tasks that are not performed in a fast-paced production environment; and furthermore, is limited to only occasional interactions with supervisors, coworkers, and the

general public.  Finally, she can attend and [sic] concentrated for two hours at a time for up to eight-hours with the two customary 10-15 minute breaks, and one customary 30-60 minute lunch break.

(AR. 26).[1]

In arriving at his decision, the ALJ placed "reduced weight on the opinions by the state agency medical and psychological consultants…" because "[t]hey were not able to review evidence subsequent to their review, including the testimony by the claimant." (AR. 30).  The ALJ gave no weight to the opinion of Nurse Practitioner Judy Hileman concerning Davis' mental impairments.  (*Id.*).  The ALJ also disagreed with the opinion of Davis' treating physician, Dr. Kim, although the ALJ did not state what weight, if any, he accorded that opinion.  (*Id.*).  Finally, the ALJ concluded that Davis' testimony with regard to the severity and functional consequences of her symptom was not fully credible. (AR. 31).

Ultimately, the ALJ adopted the opinion of the VE that Davis was capable of performing "the requirements of representative occupations such as a janitor," *Dictionary of Occupational Titles* number 323.687-014.  (AR. 32).

### THE ALJ IMPROPERLY REJECTED TREATING DR. KIM'S OPINION

It is well-settled that the opinions of treating physicians, like Dr. Kim, are entitled to greater weight than the opinions of examining or non-examining physicians.  *Andrews v. Shalala,* 53 F.3d 1035, 1040-1041 (9th Cir. 1995).  Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant. *See Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).  Medical opinions and conclusions of treating physicians are accorded special weight because treating

---

[1] Although the ALJ made no specific statements about Davis' weight or body mass index ("BMI"), he stated that he considered "the effects of…[her] obesity and included those effects within [his]…determination of the claimant's residual functional capacity."  (AR. 29 (citing SSR 02-01p)).  A June 2010 treatment record indicates that Davis was five feet, five inches tall, weighed 218.20 pounds, and had a BMI of 35.75 (AR. 708-09), and by April 2011, she weighed 235.60 pounds and had a BMI of 38.61 (AR. 905).

physicians are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; *see also Bray v. Commissioner of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to substantial weight.") (internal quotation marks and citation omitted); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989 ("We afford greater weight to a treating physician's opinion because he is employed to cure and has a greater opportunity to know and observe the patient as an individual.")(internal quotation marks and citation omitted); 20 C.F.R 20 §§ 404.1527 (generally, more weight is given to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations….").

An ALJ may reject a treating physician's uncontradicted opinion only after giving "'clear and convincing reasons' supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)). "Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick,* 157 F.3d at 725 (citing *Lester,* 81 F.3d. at 830). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'" *Tommasetti* 533 F.3d at 1041 (quoting *Magallanes,* 881 F.2d at 751).

Here, although two state agency non-examining doctors found insufficient evidence in the record to support a disability finding or any work limitations, the ALJ rejected those opinions because they did not consider all the evidence of record.  (AR. 30, 93-114).  Davis asserts that "since the ALJ rejected those opinions they are irrelevant to

- 6 -

this appeal." (Plaintiff's Brief, p. 4 (citing AR. 30)). Therefore, according to Davis, "[c]lear and convincing reasons should be required to reject Dr. Kim's assessment, since that opinion is not contradicted by any substantial evidence in the record." (Plaintiff's Brief, p. 21). Defendant does not address Davis' assertion that the ALJ must state clear and convincing to reject Dr. Kim's opinion. Instead, Defendant argues that the ALJ "reasonably disagreed with Dr. Kim…." (Defendant's Brief, p. 8). As discussed below, regardless whether the ALJ was required to state clear and convincing reasons or specific and legitimate reasons to reject Dr. Kim's opinion, the ALJ failed to satisfy both standards.

The ALJ found that Davis suffered from the severe impairments of ulcerative colitis, fibromyalgia[2], osteoarthritis, depression, and anxiety. (AR. 24).

---

[2]     Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004) (citations omitted). Common symptoms of fibromyalgia, which Davis also experiences, include chronic diffuse pain throughout the body; multiple tender points; sensitivity to stress and activity level; chronic fatigue; sleep disturbance; stiffness; and depression. *Id.* at 589-590; *Willis v. Callahan*, 979 F.Supp. 1299, 1303 n. 2 (D. Or. 1997); *see also* SSR 12-2p, 2012 WL 3104769. "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community." *Benecke,* 379 F.3d at 590. *See also Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996) (fibromyalgia is "a common, but elusive and mysterious disease..."). "'There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness, and the only symptom that discriminates between it and other diseases of a rheumatic character multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Rollins v. Massanari,* 261 F.3d 853, 855 (9th Cir. 2001) (quoting *Sarchet,* 78 F.3d at 306) (internal quotation marks omitted); *see also* SSR 12-2p, 2012 WL 3104769. The Ninth Circuit has observed that fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Benecke*, 379 F.3d at 590

In addition to seeking treatment for fibromyalgia, osteoarthritis and ulcerative colitis, Davis also underwent surgeries on her fingers and elbow, and she has also sought mental health treatment through COPE Community Services ("COPE"), beginning in April 2008. (*See e.g.,* AR. 58-62; Plaintiff's Brief, pp. 4-12).

On April 6, 2011, Dr. Yuhee Kim, M.D., Davis' treating doctor from June 2010 through at least January 2012, completed a Fibromyalgia Residual Functional Capacity (RFC) Questionnaire ("Fibromyalgia Questionnaire") and a Pain Functional Capacity (RFC) Questionnaire ("Pain Questionnaire").  (AR. 873-77; Plaintiff's Brief, p. 13).  In the Fibromyalgia Questionnaire, Dr. Kim indicated that Davis met the American College of Rheumatology's criteria for fibromyalgia, she also suffered from multiple chronic joint pain and bipolar disorder, and her impairments can be expected to last the next 12 months.  (AR. 873).  He further indicated that Davis' symptoms included: multiple tender points, nonrestorative sleep, frequent severe headaches, severe fatigue, depression, vestibular dysfunction, morning stiffness, anxiety, low back pain and panic attacks.  (*Id.*). According to Dr. Kim, Daivs' pain level was "Moderately Severe (Pain seriously affects ability to function)" and   factors that precipitated pain included changing weather, hormonal changes, humidity, movement/overuse, cold, static position, stress and heat. (AR. 874; *see also* AR. 876 (indicating same on Pain Questionnaire)).   Davis' pain was also measured to be moderately severe and expected to frequently interfere with her attention and concentration.  (AR. 874-75; *see also* AR. 876 (indicating same on Pain Questionnaire)).  Dr. Kim also stated that Davis frequently experiences deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.  (AR. 875; *see also* AR. 877 (indicating same on Pain Questionnaire)).  He stated that Davis was not considered to be malingerer.  (AR. 874).   He opined that Davis would not be able to sustain work on a regular and continuing basis, *i.e.* for 8 hours a day, 5 days per week.  (AR. 875).

The ALJ rejected Dr. Kim's opinion that Davis was unable to sustain work on a regular and continuing basis.  (AR. 30).  The ALJ stated that Dr. Kim's opinion was "not well supported by the overall evidence.  She has been able to manage her impairments with conservative treatment."  (AR. 30).  The ALJ also faulted Dr. Kim for "apparently rel[ying] quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept uncritically as true most, if not all, of what the

claimant reported." (*Id.*).  The ALJ then pointed out that he questioned the reliability of Davis' subjective complaints and cited his discussion on that point. (*Id.*).  The ALJ went on to state that

> the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another.  Another reality, which should be mentioned, is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs from the rest of the evidence of record, as in the current case.

(AR. 30).

As to this last reason, Defendant presents no argument in support of the ALJ's statement. (*See* Defendants' Brief, pp. 8-10).  Moreover, as Davis points out, an ALJ "'may not assume that doctors routinely lie in order to help their patients collect disability benefits.'"  *Lester,* 81 F.3d at 832 (quoting *Ratto v. Secretary,* 839 F.Supp. 1415, 1426 (D. Or. 1993)); (*see also* Plaintiff's Brief, pp. 24-25).  While the Commissioner may introduce evidence of actual improprieties, the ALJ cited no such evidence here and none is apparent in the record.  *See Lester,* 81 F.3d at 832.

As for the ALJ's statement that Dr. Kim's opinion was not supported by the "overall evidence[]", the Social Security Administration has explained that an ALJ's finding that a treating source medical opinion is not well-supported by medically acceptable evidence or is inconsistent with substantial evidence in the record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2011) (citing SSR 96-2p at 4, 1996 WL 374188; 20 C.F.R. § 404.1527). Treating source medical opinions are still entitled to deference and, "[i]n many cases, . . . will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at 632; *see also Reddick,* 157 F.3d at 725 (if the ALJ wishes to disregard the uncontradicted opinion of a treating physician, he or she must make findings setting out "'clear and convincing

reasons' supported by substantial evidence in the record."); *Murray v. Heckler*, 722 F.2d 499, 502 (9ᵗʰ Cir. 1983) ("If the ALJ wishes to disregard the opinion of the treating physician [in favor of a conflicting medical opinion], he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."). Thus, "[t]o say that medical opinions are not supported by sufficient objective findings or are contrary to the pereponderant conclusions mandated by the objective findings, does not achieve the level of specificity…" required by the Ninth Circuit. *Embrey,* 849 F.2d at 421. Instead, "[t]he ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Reddick,* 157 F.3d at 725.

Davis stresses that there is no support for the ALJ's belief that she "has been able to manage her impairments with conservative treatment.'" (Plaintiff's Brief, p. 23; (AR. 30; *see also* Plaintiff's Brief, p. 23). Davis is correct that there is no indication on the record that more radical treatment[3] was available for her with regard to her fibromyalgia, osteoarthritis, and mental impairments.

What remains is the ALJ's conclusion that Dr. Kim, in rendering his opinion, "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept uncritically as true most, if not, all of what the claimant reported." (AR. 30; *see also* Defendant's Brief, pp. 8-10). In focusing on Davis' symptom testimony, the ALJ and, ultimately, Defendant, overlooked the substantial medical evidence of record supporting Dr. Kim's opinion.

Dr. Kim first saw Davis on June 11, 2010, for complaints of ulcerative colitis,

---

[3] Davis took a variety of medications, used a TENS unit, and underwent injections and radiofrequency ablation for her physical impairments. (*See e.g.,* AR. 56-57, 910, 1043, 1049, 1060-61; *see also* Plaintiff's Brief, p. 7). Additionally, she was prescribed a variety of medication for treatment of her mental impairments including antidepressants (Prozac, Celexa), anxiolytics (Xanax, Atarax, Ambien) and an anti-psychotic used in the treatment of manic or mixed episodes associated with bipolar disorder (Risperdal). (Plaintiff's Brief, pp. 11-13). With regard to Davis' ulcerative colitis, the record does support a conclusion that she improved with medication as opposed to more invasive treatment. (*See e.g.,* AR. 52). However, Davis' ulcerative colitis has no bearing on Dr. Kim's opinion given that he did not list that condition as a basis for his opinion. (*See* AR. 873).

chronic pain, depression/anxiety, hypertension and hyperlipidemia. (AR. 708). He noted that Davis was a "poor historian with crying during the whole interview." (Id.). He indicated that Davis had been treated at COPE for two years for depression, "but her depression was out of control today."[4] (Id.). Davis reported that her son had died from on overdoes of narcotics in 2010. (Id.). On examination, Dr. Kim found Davis' spine was positive for posterior tenderness, tenderness on lateral epicondyle[5], she had a depressed affect and presented as "anxious, is fearful, feels hopeless, and does not have suicidal ideation." (AR. 711). Dr. Kim's assessment included, "Depressive disorder, not elsewhere classified[,] uncontrolled not consolable[,] rec hospital admission and pt agreed that because she was scared with [sic] out of control f/u with COPE[;] Ulcerative colitis…rec to have f/u with GI…[;]Unspecified essential Hypertension….[;] Hypercholesterolemia…[;]Chronic Pain Due to Trauma…f/u with pain specialist and ortho with narcotics…[;] Lateral epicondylitis…will have right elbow surgery…." (AR. 711-12). Dr. Kim also noted that Davis was obese. (AR. 711). At this time, Davis was taking the following medications: Colace, Phenergan, Prilosec, Cymbalta, Oxycodone, Hydroxyzine, Ibuprofen, Propoxyphene Nap-acetaminophen, Clonidine, Gabapentin, Asacol, Hydromorphone, Simvastatin, folic acid, Hydrochlorothiazide, and Diazepam. (AR. 712).

In July 2010, Davis presented with complaints of chronic pain, headache/dizziness/tinnitus/imbalance, bipolar disorder, ulcerative colitis, "ortho and obesity/smoking." (AR. 837). She asked for a pain shot for her back and stated that her pain specialist did not give her narcotics, but she was taking ibuprofen 800 mg and a

---

[4] The record also reflects that Davis was taken to the emergency room on June 7, 2010 with complaints of chest pain and was transferred "to psych, but she refused to go to [P]alo [V]erde [psychiatric hospital]…stating, "'I am not crazy, but just grieving for my son.'" (AR. 703, 713-14). The June 7, 2010 record of that incident, which Dr. Kim reviewed, indicated that Davis presented with complaints of anxiety and depression and reported that her 31 year-old son died two months earlier. (AR. 713). The medic's assessment was: "Disphoretic, Jerking, Hyperventilating" and Davis was sent to the emergency department (Id.).

[5] Davis reported to Dr. Kim that she was scheduled for surgery for tennis elbow. (AR. 708).

muscle relaxant.  (*Id.*).  On examination, Dr. Kim found Davis' level of distress was "anxious, irritable but consolable, uncomfortable…" and that she had a depressed affect. (AR. 839).  Although Dr. Kim did not find evidence of any spine abnormality, he noted that Davis' spine was "positive for posterior tenderness.  Paravertebral muscle spasm." (*Id.*).   His assessment included dizziness and giddiness, bipolar disorder, ulcerative colitis, and chronic pain.  (AR. 839-40). At this time, Davis was taking the following medications:  Seroquel, Risperidone, Prozac, Ropinirole, Asacol, Prilosec, Oxycodone, Hydroxyzine, Ibuprofen, Colace, Phenergan, Propoxyphene Nap-acetaminophen, Clonidine, Gabapentin, Asacol, Hydromorphone, Simvastatin, folic acid, Hydrochlorothiazide, and Diazepam.  (AR. 840).

In his August 18, 2010 treatment note, Dr. Kim indicated that Davis presented with knee pain, rash, bunion, dizziness and hearing loss, bipolar disorder and chronic back pain.  (AR. 828).  Regarding Davis' complaints of chronic back pain, Dr. Kim noted Davis' report that she regularly followed up with pain specialist Dr. Wagner who gave her "narcotics (oxycodone 5mg #180 in 8/16), but pt c/o narcotics was not enough for pain." (*Id.*).  Dr. Kim also noted that Davis cried during the appointment and complained of pain.  (*Id.*).  On examination, Dr. Kim found Davis' level of distress was "crying but consolable, irritable but consolable[]" and that she was anxious and had mood swings. (AR. 831).  Although he noted no abnormalities with her spine or back, he did find diffuse tenderness in both knees and diffuse carbuncles and furuncles under her arms, on her lower abdomen and intergluteal area.  (*Id.*).   He referred Davis to an orthopedics for her complaints of joint pain.  (*Id.*).

In August 2010, Davis was seen by Lawrence R. Housman, M.D., at Tucson Orthopaedic Institute, P.C., upon referral for consultation concerning severe pain in both knees.   (AR. 856 (Davis "thinks [the knee pain]…started with a fall in 1995 onto concrete.  She also had an accident in 1994 and 2001 which may have aggravated her knees."); *see also* AR. 858 (Dr. Housman's report was sent to Dr. Kim)).  Davis also reported joint, back and ankle pain in addition to the fact that she was scheduled for

surgery for tennis elbow and that she had recently fallen which left her with a concussion and dizziness relating to a left ear injury. (AR. 856.).  Dr. Housman observed that Davis was "in a moderate amount of distress in that she has some difficulty getting from the chair to examining table easily." (*Id.*).  On examination, Dr. Housman found:

> She has some type of rash about her facies which would question whether there is some type of systemic arthritis such as lupus.  Concerning her shoulders, she is able to forward elevate her shoulders to above the horizontal but it seems painful.  She has back pain which is generalized pain throughout the entire thoracolumbar spine.  In the lower extremities, she has some hip pain with flexion anywhere past 90, abduction past 20, although the rotation is symmetrical.
> Concerning her knees, she has some synovitis of both of her knees.  She actively extends to -5 on both flexes to 125 degrees.  Both knees are stable.  There is more irritability to the knee, however, than one would expect.  She also has some hypersensitivity around the joints.

(AR. 856-67).  Dr. Housman concluded that Davis "seems to have some type of systemic arthritis which is currently giving her severe pain in both knees but also has involved her back and other joints with a fleeting type of arthralgias.  With a history of ulcerative colitis, one wonders whether there is some type of spondyloarthropathy related to the irritable bowel syndrome."  (AR. 857).  He recommended that Davis see a rheumatologist.  (*Id.*).

In October, 2010, Mark Iannini, M.D., of Southern Arizona Rheumatology Associates, saw Davis upon referral by Dr. Kim for evaluation of musculoskeletal pain. (AR. 861).  Dr. Iannini noted Davis' complaints of diffuse pain for the past several years which has been getting worse over the past year.  (*Id.*).  Davis reported that her pain "is exacerbated by stress and weather change.  She has chronic fatigue and poor sleep and awakens exhausted in the morning." (AR. 861).  On exam, Davis was tearful and exhibited 18 out of 18 tender points consistent with the American College of Rheumatology defined anatomic locations for fibromyalgia.  (*Id.*).  He noted that her gait was normal.  (*Id.*).  Dr. Iannini diagnosed fibromyalgia syndrome; "[c]hronic depression and anxiety which is interplaying with her risk for fibromyalgia syndrome", morbid obesity, and chronic pain syndrome which was being managed by Dr. Kim.  (*Id.*).  Dr.

Iannini recommended "yoga to decrease stress which is a common trigger for fibromyalgia symptoms.  I would suggest not prescribing any further pharmacologic therapy since this patient already has polypharmacy and the risk for drug interactions would be extremely high." (*Id.*).  Dr. Iannini discharged Davis "back to [Dr. Kim's] care since I will only confirm diagnosis of fibromyalgia and will not manage these patients."[6] (AR. 862).

In October 2010, Dr. Kim noted Davis' recent diagnosis of fibromyalgia by Dr. Iannini and that Davis was "talking multiple psych meds from COPE, but she was always crying like baby in office with complaints of pain."  (AR. 821).  He further stated that Davis  "always crying in every office visit c/o pain with taking narcotics – stating 'no[t] enough for her pain'…", and that she "always asked me more [sic] stronger narcotics with crying…."  (*Id.* (also noting Davis was "already taking antidepressant and muscle relaxant")).  He found that Davis' bipolar disorder was "uncontrolled."  (AR. 824).  Although Dr. Kim prescribed Lyrica, he "refuse[d] to refill narcotics because she overuse [sic]".  (*Id.*).

Also in October 2010, Dr. Kim referred Davis to Arnold Farr, M.D., at Desert Pain & Rehab Specialists, who instituted a pain management program consisting of pain medication including low-dose morphine and Oxycodone (AR. 1060-61), trigger point injections (*Id.*; AR. 1043, 1049, 1053), use of a TENS unit (AR. 56-57, 905, 910, 1060-61), medications for fibromyalgia including Lyrica and Savella.  (AR. 1040, 1041, 1042, 1045, 1047, 1048, 1050, 1051, 1052, 0154, 1055, 1057, 1057; *see also* Plaintiff's Brief, p. 7).

In March 2011, Dr. Kim referred Davis to Augusto C. Posadas, Jr., M.D., at Arizona Endocrinology and Rheumatology Associates, for evaluation of polyathralgia. (AR. 941-43; Plaintiff's Brief, p. 7).  Dr. Posadas noted that Davis had complained of

---

[6] Defendant characterizes Dr. Iannini's statement as "simply declin[ing] to treat [Davis], telling her to exercise and do yoga." (Defendant's Brief, p. 5).  Defendant omits that Dr. Iannini did not decline to treat Davis for any reason other than that he did not manage fibromyalgia patients, but only confirmed diagnosis.  Defendant also omits that Dr. Iannini set forth cogent reasons for not recommending additional medication.

swelling in her foot, hand and knee for the past six months, she also complained of stiffness lasting about 2 hours in the morning with pain rated at six out of ten. (AR. 941). He also noted that her pain was "mostly paraspinal in nature, although she is awakened nightly 1-2 times/night due to [symptoms]. She exhibits bilateral SI TTP and with mild plantar fascial TTP, possible enthesitis." (*Id.*). On examination, Davis was found to have 18 out of 18 tender points indicative of fibromyalgia. (AR. 942). Laboratory testing ruled out other causes such as the presence of an antigen indicative of ankylosing spondylitis, which eliminated autoimmune or inflammatory etiology. (AR. 931; Plaintiff's Brief, p. 8). An x-ray of Davis' sacroiliac joints showed only "mild degenerative changes not unusual for age." (AR. 917). Dr. Posadas assessed polyarthralgia, multifactorial with definite fibromyalgia "component given PE and history of bipolar, limited activity, lack of restful sleep and depression—probably secondary condition to chronic back pain at minimum—with predominant [fibromyalgia symptoms]…." (AR. 932).

Records reflect that Dr. Kim reviewed Davis' condition, medications and treatment in March 2011. (AR. 912-15). In April 2011, Dr. Kim noted Davis' complaint that her pain was not controlled by narcotics. (AR. 905). He also indicated that Davis had been "seen by ENT…" for loss of hearing, and balance therapy was recommended "but she couldn't afford it. [R]eported that she used a walker at home." (AR. 905; *see also* AR. 1015 (May 2011 COPE note indicating Davis was "[n]ow using a cane for dizziness and imbalance.")). By this point, Davis weighed 235.60 pounds and had a body mass index of 38.61. (AR. 905). On examination, Dr. Kim found Davis' level of distress was anxious but there was no unusual anxiety or evidence of depression. (AR. 908). He found Davis was tender all over her body. (*Id.*). Vertigo was added to her diagnoses which also included chronic pain, myalgia and myositis, bipolar disorder, obesity, and hypertension. (*Id.*). At this time, Davis was taking Ropinirole, Hydroxyzine, Gabapentin, Lyrica, Ibuprofen, Savella, Vivelle, Clonidine, Hydrochlorothiazide, Omeprazole, Asacol. Colace, Methocarbamol, Simvastatin, Percocet, Morphine Sulfate,

Zolpidem Tartrate, Proxyphene Nap-acetaminophen, Phenergan, and folic acid.   (AR. 908-09).

Contrary to the ALJ's characterization, there is no indication in the record that Dr. Kim "accept[ed] uncritically as true most, if not all, of what the claimant reported."   (AR. 30).   Instead, Dr. Kim made his own clinical assessments and observations and sent Davis to specialists to confirm and/or rule out conditions.   What Dr. Kim determined based on his own examination results and the information he received from the specialists to whom he had referred Davis, was that Davis suffered from fibromyalgia and/or polyarthraliga with a definite fibromyalgia component in addition to her bipolar disorder. Davis only received temporary relief from various treatment and medications prescribed and despite this, she still presented for treatment.   Although Defendant attempts to argue that Dr. Kim was, at best, unaware of or, at worst, deceived by what Defendant refers to as Davis' "history of drug-seeking behavior" (Defendant's Brief, p. 8), the record does not support this conclusion.   While Davis admitted in 2008 to abusing cocaine in the past, the record reflects she was no longer using.   (AR. 318-19 (COPE note indicating that Davis "is currently not substance-abusing.   Per her history she was using up until four or five years ago and she has been clean from cocaine since then.   She actually is tested by the CPS people involved with the child custody suit…" involving Davis' grandchildren)). Davis was open that she took more medication than prescribed because the amount prescribed did not help her.   (See e.g.¸ AR. 318 (June 2008 COPE evaluation noting that although Davis had been prescribed Xanax three times per day, "she has been taking up to five a day…to control her anxiety.")).   Davis points out that the ALJ did not find that substance abuse was a severe impairment.   (Plaintiff's Reply, p. 3).   Moreover, Dr. Kim was quite aware of Davis' "overuse" and complaints that the prescribed narcotics were "'no[t] enough for her pain'"   (AR. 821; see also AR. 822 (Dr. Kim also stated "wasting time to talk about pain and narcotics, and so no[t] enough time to discuss about her chronic or acute disease")).[7]   Defendant contends that Dr. Kim's "clinic continued to give

_____

[7] Elsewhere in the record, a COPE note reflected that Davis "has not shown

Plaintiff medications, such as oxycodone and MS Contin, through the remainder of the relevant time period." (Defendant's Brief, p. 2 (citing AR. 1048 (Dr. Farr's treatment note)). There is absolutely no indication in the record that these medications were unwarranted. Moreover, Dr. Kim who worked at El Rio Community Health Care, and not at Dr. Farr's clinic, actually refused to refill Davis' narcotics, deciding to defer to the pain specialist. (*See* AR. 824). The fact that Dr. Kim did not accede to Davis' requests for narcotics undermines the ALJ's position that Dr. Kim accepted, uncritically, her subjective complaints. While Dr. Kim acknowledged Davis' "overuse" of medication, he never indicated he felt she was being deceptive; rather, she was always clear in her position that the prescribed medications did not adequately treat her pain and/or other symptoms. Nor did Dr. Kim find that Davis was malingering. (*See* AR. 874). Although fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms", *Benecke,* 379 F.3d at 590, the ALJ has failed to provide a basis for his conclusion that Dr. Kim relied on Davis' statements and/or her subjective complaints more heavily than his own clinical observations in reaching the conclusions expressed in his opinion. *See e.g. Ryan v. Commissioner of Soc. Sec.,* 528 F.3d 1194, 1200 (9th Cir. 2008). Instead, the substantial evidence of record suggests otherwise.

Defendant also argues that elsewhere in the decision when not specifically discussing Dr. Kim, "the ALJ reasonably cited" evidence that Davis' anxiety and depression was stable on medication, which served to undermine Dr. Kim's assertion that Davis "had depression, anxiety, panic attacks, and pain that kept her from working." (Defendant's Brief, p. 9). According to Defendant, Davis' anxiety and depression were stable on medications and that the GAF scores[8] assigned to her indicated only mild or

---

enough insight to see that she was overusing her meds and that, even then, they were not helping her symptoms." (AR. 323).

[8] The Ninth Circuit has explained that:

"A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert,* 159 F.3d 1161, 1164 n. 2 (9th Cir.1998). According to the DSM–IV, a GAF score between 41 and 50 describes

moderate symptoms.  (Defendant's Brief, p. 9).  However, Defendant overlooks that "a condition can be stable but disabling."  *Petty v. Astrue,* 550 F.Supp. 2d 1089, 1099 (D. Ariz. 2008).  Moreover, the records Defendant cites (*see* Defendant's Brief, p. 9, ll. 11-12) to support her positon also indicate that Davis presented with labile effect, pressured speech and an anxious, angry mood (AR. 308 (GAF of 65)); pressured speech, and poor insight (AR. 309 (GAF of 65));  pressured speech, anxious mood and crying throughout visit (AR. 310 (GAF of 65); blunted affect, monotone speech, and depressed mood (AR. 1003 (GAF of 55)); and a labile affect (tearful vs blunted) and monotone speech (AR. 1006 (GAF assessed of 55)).   Other records cited by Defendant on this same point reflected that despite normal examination, Prozac dosage was increased (AR. 795-96 (GAF of 55)) and Davis complained during a telephonic appointment about fair sleep with racing thoughts, "copious depression and anxiety with mood swings[]", and picking at scabs when anxious (AR. 1001(GAF of 55)).  (Defendant's Brief, p. 9, ll. 11-12; *see also id.* (citing AR. 773-75 (GAF of 55), 1005 (client no show, GAF score remained at 55)).   Dr. Kim's treatment notes reflected time and again that Davis presented as crying with a depressed and/or anxious affect and, at times, she was inconsolable.  Further, at

---

"serious symptoms" or "any serious impairment in social, occupational, or school functioning." A GAF score between 51 to 60 describes "moderate symptoms" or any moderate difficulty in social, occupational, or school functioning." Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement. We note, however, that GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects. *See, e.g., Titles II & XVI: Capability to Do Other Work–The medical–Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments,* SSR 85–15, 1983–1991 Soc. Sec. Rep. Serv. 343 (S.S.A 1985) ("The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.").

*Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014).  Additionally a GAF score between 61 and 70 indicates the patient experiences "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning" but is "generally functioning pretty well has some meaningful interpersonal relationships." *DSM-IV* at 4.

times, he indicated uncontrolled depression and, on one occasion, uncontrolled bipolar disorder.

In sum, Dr. Kim's assessment properly considered Davis' physical impairments in combination with her mental impairments. A claimant's combined impairments must be considered in arriving at the RFC assessment. *See e.g. Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) ("[T]he ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe."). Here, the reasons given by the ALJ to discount Dr. Kim's opinion are not supported by either clear and convincing or specific and legitimate reasons. Instead, the substantial evidence of record supports Dr. Kim's assessment.[9]

### REMAND FOR AN IMMEDIATE AWARD OF BENEFITS

Davis requests that the Court credit Dr. Kim's opinion and remand this matter for an immediate award of benefits. (Plaintiff's Brief, p. 25; *see also id.* at pp. 36-38). Alternatively, she requests that the matter be remanded for further proceedings before a different ALJ. (*Id.* at p. 38).

Remand for an award of benefits is appropriate where:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison,* 759 F.3d at 1020 (footnote and citations omitted). The *Garrison* court also noted that the third factor "naturally incorporates what we have sometimes described as a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made." *Garrison,* 759 at 1020 n. 26 (citing *Smolen,* 80 F.3d at 1292); *see also Treichler v. Commissioner of Soc.*

---

[9] Because, as discussed below, remand for an immediate award of benefits is appropriate based on the improper rejection of Dr. Kim's opinion, the Court does not reach Davis' arguments asserting error on other issues.

*Sec.,* 775 F.3d 1090, 1103 (9th Cir. 2014) (in evaluating whether further administrative proceedings would be useful, "we consider whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules."). Where the test is met, the Ninth Circuit "take[s] the relevant testimony to be established as true and remand[s] for an award of benefits[,]" *Benecke,* 379 F.3d at 593 (citations omitted), unless "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison,* 759 F.3d at 1021 (citations omitted).

Here, remand for an immediate award of benefits is appropriate. The record has been fully developed and remand for further administrative proceedings would serve no useful purpose. Dr. Kim's statement is supported by the substantial evidence of record. Crediting Dr. Kim's opinion as true results in the unquestionable conclusion that Davis is unable to perform sustained work on a regular and continuing basis. *See* SSR 96-9p, 1996 WL 374185, *2 (to be found not disabled, the claimant must be able "to perform sustained work on a regular and continuing basis; *i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule."). The Court reaches this conclusion despite the ALJ's finding that Davis was not entirely credible. For the reasons stated above, the ALJ's conclusion that Dr. Kim uncritically accepted Davis' subjective complaints was not supported by the substantial evidence of record. Moreover, upon consideration of the substantial evidence of record, this Court has no reason for serious doubt as to whether Davis is disabled under the Act.

**CONCLUSION**

The record is fully developed and, when considering the record as a whole, there is no reason for serious doubt as to whether Plaintiff is disabled. Accordingly,

IT IS ORDERED that the decision of the Commissioner denying Plaintiff's claim for benefits is REVERSED.

IT IS FURTHER ORDERED that this action is REMANDED to the

1    Commissioner for immediate calculation and award of benefits.

2           The Clerk of Court is DIRECTED to enter Judgment accordingly and to close this

3    case file.

4           Dated this 30th day of September, 2015.

5

6

7    **CHARLES R. PYLE**

8    **UNITED STATES MAGISTRATE JUDGE**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28